IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

PJ GOLD, LLC,

               Plaintiff,

               vs.                              Case No. 03-1449-JTM

CANDLEWOOD SHELLS, LLC, et al.,

               Defendants.

## MEMORANDUM AND ORDER

This matter comes before the court on the defendant's Motion for Summary Judgment (Dkt. No. 40). Defendants argue that plaintiff's four-count petition must be dismissed as a matter of law because the Purchase and Sale Agreement between the parties is illusory and therefore unenforceable. In the alternative, defendants argue that plaintiff rescinded the contract. In response, plaintiff argues that a valid contract exists, and defendants' failure to deposit the purchase price into an escrow account constituted a breach of contract. Plaintiff requests it be compensated for expenses incurred in relation to the Agreement.

## I. PROCEDURAL HISTORY

This action arises from a failed transaction to purchase a food shell production plant located in McPherson, Kansas. The action was originally brought in McPherson County District Court, but defendants removed the action to this court on or about December 12, 2003. The pre-trial order sets out plaintiff's theories of recovery. In Count I, plaintiff seeks recovery from the

defendants for their alleged breach of the July 10, 2002 Purchase and Sale Agreement. In Count II, plaintiff seeks recovery in indemnity from the defendants for expenses incurred in removing mechanics' liens from the plant upon the failure of the sale transaction. This is an alternate claim to Count I, as those expenses are also included in the damages in Count I. In Count III, plaintiff seeks recovery from the defendants for their alleged breach of contract in failing to repay the overcharges. In Count IV, plaintiff seeks recovery from defendants for their breach of contract in failing to pay the cold storage charges. Three counts sound in contract, and one sounds in indemnity. Unless otherwise found, Kansas law governs the substantive contractual issues in this case.

## II. FINDINGS OF FACT

Plaintiff PJ Gold, LLC ("Gold" or "PJ Gold"), a wholly-owned affiliate of Papa John's International, Inc., is in the business of purchasing food shells for distribution. Ex. A, Complaint at ¶ 1; Ex. B, Purchase Order dated November 4, 2002. PJ Gold held an option to purchase a food shell manufacturing plant located in McPherson, Kansas, and owned by McPherson Production Company ("McPherson"). Ex. A at ¶ 9; Ex. C, Option to Purchase Agreement, at PJG v. CW 002261, PJG v. CW 002281. As part of the option, PJ Gold was entitled to use the manufacturing plant. Ex. A at ¶ 11. Defendants Candlewood Shells, LLC ("Candlewood") and White Hat Food & Beverage Group, LLC ("White Hat") entered into an agreement to purchase the manufacturing plant from PJ Gold after exercise of the option by PJ Gold. Ex. A at ¶ 17; Ex. D, Purchase and Sale Agreement. Defendants Frank Patton, Brad Kuluris (through a separate entity), Tim Riedel, and Gary Pryor are all members of White Hat, which is in turn the sole

member of Candlewood.[1]  Ex. A at ¶ 2-6.   Before the purchase was set to close, PJ Gold allowed

Candlewood to use the manufacturing plant to produce food shells for sale to PJ Gold.  Ex. A at ¶

25.

**A. The Option to Purchase Agreement.**

PJ Gold and McPherson entered into the Option to Purchase Agreement on December 31,

2001.  Ex. C at PJG v. CW 002261.  The Option to Purchase Agreement provides in pertinent

part:

> **5. IMPROVEMENT OF THE PREMISES**. . . . PJ Gold also agrees to hold McPherson
> harmless from claims for mechanics, materialmen or other liens arising in connection
> with any alterations, additions or improvements made to the Premises . . . . PJ Gold shall
> not commit waste, or allow or permit waste to be committed, on the Premises. PJ Gold
> shall surrender the Premises at the expiration or termination of the Term in the same
> condition as exists on the Effective Date (subject to such alterations, additions and
> improvements, which themselves will be in good order and repair), reasonable wear and
> tear excepted . . . . Promptly following the surrender of the Premises by PJ Gold, at
> McPherson's option, PJ Gold shall restore the Premises to their original condition as at
> the Effective Date, reasonable wear and tear excepted, if McPherson, acting in its
> reasonable business judgement, shall determine that the alterations, additions or
> improvements made by PJ Gold to the Premises limit the marketability of the Premises by
> McPherson.
>
> **7. UTILITY CHARGES**. PJ Gold shall pay all utility charges which may be levied, accessed
> or imposed upon or against the Premises, including, but not limited to, all charges for
> heating, electricity, air conditioning, telephone, water, sewer and trash removal services. .
> . .
>
> **8. PROPERTY TAXES**. McPherson shall pay all ad valorem real property taxes and
> assessments applicable to the Premises during the Term, and PJ Gold shall reimburse
> McPherson for the same upon request from McPherson. . . .
>
> **9. MAINTENANCE OF PREMISES**. PJ Gold shall, at its expense, keep and maintain the
> Premises, including all structural components thereof, in the same condition as exists on
> the date hereof, reasonable wear and tear excepted, and perform (or caused to be
> performed) all maintenance and repairs required to keep the same in such condition. . . .
>
> **12. PJ GOLD'S OPTION TO PURCHASE PREMISES AND OTHER ASSETS.**

---

[1] Hereafter the Candlewood, White Hat and individually named defendants will be
referred to as "Candlewood defendants" or simply "defendants."

\* \* \*

**12.7** *Certain Tax Commitments.*

(a) PJ Gold acknowledges that:

(i) OSI International Foods, Ltd. ("OSI"), a member of McPherson, and NCM Foods, LLC ("NCM") entered into that certain Agreement Regarding Property Tax Abatements dated January 14, 2000 ("Tax Abatement Agreement");

\* \* \*

(v) As further consideration to McPherson for the sale of the Premises, PJ Gold shall pay, beginning as of the date of this Agreement, the required interest payments resulting from, arising out of or relating to the Tax Abatement Agreement. The principal payments due as of the date of this Agreement and thereafter resulting from, arising out of or relating to the Tax Abatement Agreement shall also be paid by or reimbursed by PJ Gold, as the case may be, upon Closing.

\* \* \*

(g) consistent with Section 8 above, any ad valorem property taxes which have not been abated and which are assessed against or with respect to any Option Assets for any periods following December 31, 2001, shall be the sole responsibility of, and shall be duly and timely paid and discharged by (or if assessed against McPherson, promptly reimbursed by), PJ Gold without recourse against McPherson.

**21. MISCELLANEOUS.**

\* \* \*

**21.8** *Governing Law.* This Agreement is being delivered in the State of Kansas and shall be construed, interpreted and enforced in accordance with the laws of such State, without regard to its conflicts of laws rules.

## B. The Purchase and Sale Agreement

The Candlewood defendants and PJ Gold entered into the Purchase and Sale Agreement

on July 10, 2002.  Ex. D at 1.  The Purchase and Sale Agreement provides:

**1. PURCHASE AND SALE OF OPTION ASSETS**

\* \* \*

*e. Exercise of Option.*

(iv) . . . in the event Candlewood and White Hat shall fail to deliver the entire Purchase Price into escrow with PJ Gold as contemplated in Subsection d.(iii) above; PJ Gold shall be entitled thereafter (y) to purchase the Option Assets from McPherson pursuant to the Option Agreement without further obligation to sell the same to Candlewood or White Hat pursuant to this Agreement or to otherwise account to them for such assets or otherwise hereunder, or (z) to exercise any right that PJ Gold may have under the Option Agreement to withdraw its option exercise notice to McPherson and to decline to complete the Option Assets.

\* \* \*

4

**g. *Withdrawal of Exercise Notice***. . . . Candlewood and White Hat agree that PJ Gold shall have the right, exercisable in its sole discretion without the prior written consent of Candlewood or White Hat and without further obligation to Candlewood or White Hat (other than as provided below), to exercise any of those rights to terminate the Option Agreement or to withdraw its option exercise notice delivered to McPherson and/or to refuse to close the purchase of the Option Assets from McPherson. . . .

* * *

**i. *Purchase Price Adjustment***. Candlewood acknowledges that pursuant to Section 12.7 of the Option Agreement, PJ Gold has undertaken obligations to pay to the Lenders (or to NCM Foods, LLC for payment to those Lenders), certain interest and principal payments that have accrued or may hereafter accrue resulting from, arising out of or relating to an Agreement Regarding Property Tax Abatements, dated January 14, 2000, among OSI International Foods, Ltd. (a member of McPherson) and NCM Foods, LLC (the "Tax Abatement Agreement"). . . . The parties hereto agree that in the event (but only in the event), prior to the Closing, Candlewood shall: (a) reimburse PJ Gold for any and all interest and principal amounts that were theretofore paid by PJ Gold to those Lenders (or to NCM Foods, LLC for application against its debt to those Lenders) . . . then the Purchase Price payable by Candlewood at the Closing pursuant to Section 1.d. shall be automatically reduced by the amount contemplated in Subclause (z) of Section 1.d.(ii) above. . . .

* * *

**5. Reimbursement for Certain Charges**. At any Closing, Candlewood and White Hat agree to reimburse PJ Gold for all customary utility expenses (including, but not limited to, heating, electricity, air conditioning, telephone, water, sewer and trash removal service expenses) incurred by PJ Gold (or for which PJ Gold is or was required to reimburse McPherson) in connection with the use, occupancy, operation or maintenance of the Option Assets from the date of the Option Agreement through that Closing, and for all ad valorem property taxes that may have been levied, accessed or imposed upon or against any of the Option Assets and for which PJ Gold bore responsibility under the Option Agreement.

* * *

**11. Miscellaneous**

* * *

**b. *Entire Agreement***. This Agreement constitutes the entire agreement of the parties hereto pertaining to its subject matter, and supersedes all prior or contemporaneous agreements, undertakings and understandings of the parties in connection with the subject matter hereof.

* * *

**g. *Governing Law***. This Agreement shall be construed, interpreted and enforced in accordance with the laws of the State of Kansas, without regard to its conflicts of laws rules. . . .

**C. The Failed Closing**

The Candlewood defendants were unable to obtain the financing necessary to deliver the amount due in escrow by the deadline established under the Purchase and Sale Agreement. See Ex. A, Complaint at ¶¶ 24, 26. Prior to the failed closing, PJ Gold obtained a "right to withdraw option" from McPherson, which entitled PJ Gold to cancel its exercise of the option to purchase the manufacturing plant. Ex. A at ¶ 16; Ex. E, Facilities Use Agreement, at ¶ 1.4. On December 12, 2002, the day before the date set for closing under the Purchase and Sale Agreement, PJ Gold delivered to McPherson its withdrawal notice canceling PJ Gold's right and obligation to purchase the manufacturing facility. Ex. A at ¶ 23; Ex. F, December 12, 2002 Withdrawal of Option Exercise Notice.

**D. Alleged Advance and Cold Storage Facility Arrangement**

By document entitled "Binding Letter of Intent" ("BLOI"), dated February 28, 2002, PJ Gold agreed to purchase 500,000 pizza dough shells from Heartland Gold Foods, LLC upon specified terms. Ex. C at ¶ 4. During production of the pizza dough shells pursuant to the BLOI, the BLOI was assigned to Candlewood. Thereafter, Candlewood produced the remaining shells and was paid for them. Smith Aff. Ex. A at ¶ 5. Upon completion of the initial 500,000 pizza dough shells called for under the BLOI, PJ Gold decided to extend the test production of the shells and agreed with Candlewood to a new rate of $.70 per shell. This agreement was in accordance with ¶ 4 of the BLOI that further test shells would be produced for a market reasonable rate not to exceed $.75 per shell. See Smith Aff. Ex. A and BLOI Ex. C at ¶ 4. As an accommodation to Candlewood and to help Candlewood meet cash flow needs, PJ Gold agreed to pay Candlewood $1.00 per shell. PJ Gold paid Candlewood $1.00 per shell for those pan

6

pizza dough shells that were purchased after the first 500,000 shells were completed.  Smith Aff. Ex. A at ¶¶ 33, 34.  The parties dispute whether there was a $.30 advancement per shell and whether PJ Gold voluntarily paid this advancement or expected to be reimbursed.

PJ Gold instructed Candlewood to invoice all shell sales as F.O.B.: "Pick-Up @ Cold Storage."  Ex. G, June 12, 2002 facsimile.  PJ Gold paid for unpaid cold storage fees incurred to store food shells.  See Ex. A, Complaint at ¶ 36.  The parties dispute whether PJ Gold paid these fees voluntarily and whether PJ Gold is entitled to reimbursement for these payments.

## II. STANDARD FOR SUMMARY JUDGMENT

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  In considering a motion for summary judgment, the court must examine all evidence in a light most favorable to the opposing party.  McKenzie v. Mercy Hospital, 854 F.2d 365, 367 (10th Cir. 1988).  The party moving for summary judgment must demonstrate its entitlement to summary judgment beyond a reasonable doubt.  Ellis v. El Paso Natural Gas Co., 754 F.2d 884, 885 (10th Cir. 1985).  The moving party need not disprove plaintiff's claim; it need only establish that the factual allegations have no legal significance.  Dayton Hudson Corp. v. Macerich Real Estate Co., 812 F.2d 1319, 1323 (10th Cir. 1987).

In resisting a motion for summary judgment, the opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs.  Rather, the nonmoving party must come forward with specific facts showing the presence of a genuine issue of material fact for trial and significant probative evidence supporting the allegation.  Anderson v. Liberty Lobby, Inc.,

7

477 U.S. 242, 256 (1986).  Once the moving party has carried its burden under Rule 56(c), the

party opposing summary judgment must do more than simply show there is some metaphysical

doubt as to the material facts.  "In the language of the Rule, the nonmoving party must come

forward with 'specific facts showing that there is a genuine issue for trial.'"  Matsushita Elec.

Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e))

(emphasis in Matsushita).  One of the principal purposes of the summary judgment rule is to

isolate and dispose of factually unsupported claims or defenses, and the rule should be

interpreted in a way that allows it to accomplish this purpose.  Celotex Corp. v. Catrett, 477 U.S.

317 (1986).

## III. ANALYSIS

### A. Existence of a Contract

In response to Count I, defendants' motion raises the central issue of whether there is a

valid and enforceable contract.  Defendants argue that as a matter of law the Purchase and Sale

Agreement cannot support a breach of contract claim for two reasons: 1) the Agreement is an

illusory and therefore unenforceable contract; and 2) the Agreement establishes PJ Gold's

exclusive remedies for breach, none of which include money damages.  Citing *subsection g* of

the PSA, defendants contend that although a contract may be formed through an exchange of

promises, here only plaintiff had discretion to determine whether to perform.

An illusory promise is a promise that provides one party with complete discretion

whether to perform.  Evolution, Inc. v. SunTrust Bank, 342 F. Supp. 2d 964, 970 (D. Kan. 2004)

citing CIT Group/Sales Financing, Inc. v. E-Z Pay Used Cars, Inc., 29 Kan. App. 2d 676, 678-79,

32 P.3d 1197 (Kan. Ct. App. 2001).  Where one party has an absolute, unlimited right to

withdraw from an agreement and would have no obligation under the agreement, the alleged

contract would not be binding.  Hoxeng v. Topeka Broadcomm, Inc. 892 F. Supp. 243, 245 (D.

Kan. 1995) (citations omitted).  The Restatement (Second) of Contracts § 2 comment e provides:

"[w]ords of promise which by their terms make performance entirely optional with the

'promisor" whatever may happen, or whatever course of conduct in other respects he may

pursue, do not constitute a promise."  Since the promise does not actually give anything, it cannot

serve as consideration to create a contract.  Without consideration, a promise is illusory and

forms only an illusory contract. CIT, 32 P.3d at 1200-01. However, where  a contract reserves a

right to cancel with some restrictions, the contract cannot fail for want of consideration.  Flight

Concepts Ltd. Partnership v. Boeing Co., 819 F. Supp. 1535, 1554 (D. Kan. 1993);  Sylvan Crest

Sand & Gravel Co. v. United States, 150 F.2d 642, 644-45 (2d Cir. 1945); Boccardo v. United

States, 341 F. Supp. 858, 862-63 (N. D. Cal. 1972). "Whether the contract is illusory depends

upon the other aspects of the contract."  Flight Concepts, 819 F. Supp. at 1554.

It is helpful in understanding *subsection g* to read the provision in its entirety:

**g. Withdrawal of Exercise Notice**.  Candlewood and White Hat acknowledge that PJ
Gold has reserved certain rights, pursuant to the Option Agreement, (i) to terminate the
Option Agreement upon a breach or default by McPherson thereunder, or (ii) to withdraw
PJ Gold's option exercise notice delivered to McPherson and/or to refuse to close the
purchase of the Option Assets from McPherson in the event (A) a representation or
warranty of McPherson in the Option Agreement is discovered to have been inaccurate in
any material respect as of the execution of the Option Agreement or, under certain
circumstances, following that execution but prior to the purchase of the Option Assets,
(B) certain casualty damages or losses to the Option Assets occur prior to the purchase of
the Option Assets, or (C) certain defects in McPherson's title to the Option Assets are not
cured, removed or remedied by McPherson prior to the purchase of the Option Assets.
*Candlewood and White Hat agree that PJ Gold shall have the right, exercisable in its
sole discretion without the prior written consent of Candlewood or White Hat and
without further obligation to Candlewood or White Hat (other than as provided below),
to exercise any of those rights to terminate the Option Agreement or to withdraw its*

9

> *option exercise notice delivered to McPherson and/or to refuse to close the purchase of the Option Assets from McPherson.* To the extent reasonably practicable under the circumstances, PJ Gold shall confer with Candlewood and White Hat regarding the reason for the exercise of such right(s) prior to the exercise of the same. Upon the exercise of any such right by PJ Gold, and unless PJ Gold, Candlewood and White Hat shall agree to an alternate arrangement, PJ Gold shall promptly thereafter return to Candlewood and White Hat the Purchase Price amounts therefore delivered by Candlewood or White Hat to it (without interest), and the parties shall thereafter be released from any further obligation to each other pursuant to this Agreement other than a party's liability for its own breach of default hereunder occurring prior to the return of those amounts.

Ex. D, at 6 (emphasis added). After reading the entirety of *subsection g*, the court finds that the Purchase and Sale Agreement was not an illusory contract. Defendants attempt to read the second part of the subsection out of context so that it does not distinguish between the Purchase and Sale Agreement and the Option Agreement. In fact, *subsection g* attempts to clearly distinguish PJ Gold's obligations under a contract with McPherson from its obligations under the Purchase and Sale Agreement with the Candlewood defendants.

The first half of the subsection states that PJ Gold "has reserved certain rights" pursuant to the Option Agreement with McPherson. The subsection further elaborates under what conditions PJ Gold may terminate or withdraw from the Option Agreement. The subsection notes that PJ Gold has the "sole discretion" to exercise "any of those rights" to terminate or to withdraw from agreements with McPherson. Based on the structure of the subsection, "those rights" may reasonably be understood to refer to the rights outlined in the first half of the subsection, which could only be exercised under particular conditions precedent. Furthermore, PJ Gold is required to confer with the Candlewood defendants to the extent reasonably practicable under the circumstances. The contract also clearly states that PJ Gold should return the purchase price releasing the parties from the Purchase and Sale Agreement. After a full

10

reading of the subsection, the court finds that PJ Gold did not have sole discretion.  As a result, the contract was not illusory and unenforceable as defendants contend.  Thus, summary judgment is not warranted.  See Flight Concepts, 819 F. Supp. at 1554.

## B. Existence of Remedies under the Purchase and Sale Agreement

Defendants also argue that *subsection e* is an exclusive remedies provision, and therefore plaintiff should not be permitted to recover anything beyond what is outlined in the provision. Plaintiff disagrees with this interpretation.

Under Kansas law, parties may fashion their own remedies, including the adoption of exclusive remedies.  " 'The mere fact that the contract provides a party with a particular remedy does not, of course, necessarily mean that such remedy is exclusive.... A construction which renders the specified remedy exclusive should not be made unless the intent of the parties that it be exclusive is clearly indicated or declared.' " Vanderpool v. Higgs, 10 Kan. App .2d 1, 2, 690 P.2d 391, 393 (Kan. App. 1984) (citing Vandergriff Chevrolet Co., Inc. v. Forum Bank, 613 S.W.2d 68, 70 (Tex. Civ. App. 1981)).  "The specification in a contract of a particular remedy to be used in case of default may operate to exclude all other remedies, but whether it does so depends upon specific provisions relating thereto and upon intent as disclosed by reasonable construction of whole contract." Smith v. Quivira Land Co., 113 P.2d 1077, 1077 (Kan. 1941).

In relevant part, *subsection e* provides:

***e. Exercise of Option.***

(iv) . . . in the event Candlewood and White Hat shall fail to deliver the entire Purchase Price into escrow with PJ Gold as contemplated in Subsection d.(iii) above; PJ Gold shall be entitled thereafter (y) to purchase the Option Assets from McPherson pursuant to the Option Agreement without further obligation to sell the same to Candlewood or White Hat pursuant to this Agreement or to otherwise account to them for such assets or otherwise hereunder, or (z) to exercise any right that PJ Gold may have under the Option

11

Agreement to withdraw its option exercise notice to McPherson and to decline to
complete the Option Assets.

Ex. D, at 5.

After reviewing the subsection and the applicable Kansas law, the court finds that
defendants' argument fails for three reasons. First there is no clear indication that the parties
intended *subsection e* to be the exclusive remedies provision. No specific intent has been
expressed.  Second, the contract as a whole does not support interpreting *subsection e* as the
exclusive remedies provision.  If one compares *subsection e* with *subsection g*, it is clear that the
contracting parties were aware that other remedies existed.  In *subsection g*, the Purchase and
Sale Agreement includes a sentence stating that in the event of a withdrawal or termination of the
Option Agreement, PJ Gold will return the purchase price without interest and "the parties shall
*thereafter be released from any further obligation* to each other pursuant to this Agreement *other
than a party's liability for its own breach or default* hereunder occurring prior to the return of
those amounts."  Ex. D, at 6 (emphasis added).  *Subsection g* clearly contemplates the
continuing existence of liabilities and obligations for a breach.  *Subsection e*, however, does not
include a similar caveat.

In harmonizing the two provisions, the court notes that *subsection g* specifically states
that the parties shall be released of further obligations, making it necessary to include the caveat
of the continuing existence of other liabilities.  On the other hand, *subsection e* does not include a
release, which would make the extra caveat unnecessary.  Thus, under *subsection e,* other
remedies may be reasonably considered to exist because there is no indication that the parties
have been released from their obligations by exercising the options available in the provision. In

light of the contract as a whole, *subsection e* is best interpreted as a mitigation provision.

Finally, defendants' cited case is not analogous and reliance on In Re Villa West Association, 146 F.3d 798 (10th Cir. 1998) is misplaced.  The case involved a partnership agreement with express provisions as to the course of action in case of default.  Id. at 805. Because the provisions provided specific liabilities and penalties, the court found money damages would be inconsistent with the partnership agreement and the intent of the parties.  Id. Here, there are no express provisions as to liabilities and remedies that would eliminate the need for money damages.

For the foregoing reasons, the court finds summary judgment inappropriate as to exclusive remedies.

**C. Recovery of Lost Profits**

In relation to the expenses for breach of contract in Count I, defendants argue that since PJ Gold voluntarily chose to disaffirm its contractual right to purchase the manufacturing plant, it should not be permitted to recover lost profit damages of approximately $1.4 million.  Plaintiff disagrees with the characterization of the disaffirmance as "voluntary" and urges the court to view its actions as an attempt to mitigate PJ Gold's losses after defendants' breach.

Under Kansas law, "[t]o recover lost profit damages, the lost profits must have been contemplated at the time of contracting, must proximately result from a breach or termination of the contract, and must be shown with a reasonable degree of certainty."  MLK, Inc. v. University of Kansas, 23 Kan. App. 2d 876, 876 Syl. ¶ 2, 940 P.2d 1158, 1159 (Kan. App. 1997).   In general, Kansas law requires that the party injured by a contract breach mitigate damages to be

13

eligible for lost profits.  <u>Dealers Leasing, Inc. v. Allen</u>, 26 Kan. App. 2d 745, 753-54, 994 P.2d

651, 657 (Kan. App. 1999).  The injured party has a duty to exercise reasonable care to avoid loss

or to mitigate and minimize the resulting damage.  <u>Id.</u> (citations omitted).  "The injured party is

bound to protect himself if he can do so with reasonable exertion or at trifling expense, and can

recover from the delinquent party only such damages as he could not, with reasonable effort,

have avoided."  <u>Id.</u> (citing <u>In re Estate of Stannard</u>, 179 Kan. 394, Syl. ¶ 1, 295 P.2d 610 (1956)).

"The rule ... is simply that damages are not recoverable for harm that the plaintiff should have

foreseen and could have avoided by reasonable effort without undue risk, expense or

humiliation."  <u>Id.</u> at 753 (citing <u>Theis v. duPont, Glore Forgan, Inc.</u>, 212 Kan. 301, 307, 510 P.2d

1212 (1973).  <u>See also</u> <u>Lindsley v. Forum Restaurants, Inc.</u>, 3 Kan. App. 2d 489, Syl. ¶ 5, 596

P.2d 1250, <u>rev. denied</u> 226 Kan. 792 (1979) (Mitigating damages is not an unlimited duty, and an

injured party is required "only to exert reasonable efforts to prevent or minimize his damages

within the bounds of common sense.").

       After reviewing the available precedent, the court finds defendants' cited cases are clearly

distinguishable.  <u>See</u> <u>Morris Plan Leasing Co. v. Karns</u>, 415 P.2d 291, 295 (Kan 1966) (turning

on a contractual provision to determine available remedies);  <u>Coffeyville State Bank v. Lembeck</u>,

227 Kan. 857, 857, 610 P.2d 616, 617 (Kan. 1980) (finding that where "the creditor sues on the

accord and recovers a judgment, rather than suing on the original claim, the creditor is estopped

from attempting to revive the original claim).  As set out by the court, the general rule in Kansas

provides a solid foundation to analyze the question of lost profits.  Here, PJ Gold rescinded its

Option Agreement with McPherson because of defendants' breach of payment of the purchase

price in an escrow account.  Separately, plaintiff secured an agreement to withdraw from the

McPherson Option Agreement by paying $100,000 to McPherson.  Although plaintiff's action

made the Purchase and Sale Agreement impossible to perform, PJ Gold did not rescind the

Purchase and Sale Agreement but merely attempted to mitigate the damages associated with

defendants' breach.  Had PJ Gold canceled its contract with McPherson for a reason apart from

the defendants' breach or grounds not specifically stipulated to in the Purchase and Sale

Agreement, then PJ Gold would have remained liable to the Candlewood defendants, even

though the contract would become impossible to perform.  The same liability is applicable to the

Candlewood defendants when they breach.  Therefore, summary judgment is not appropriate for

the lost profits.

**D. Other Facility Expenses**

**1. Contract Theory of Recovery**

　　　　In response to plaintiff's allegation in Count I, defendants argue that they are not liable

for the utility expenses, real property taxes, the costs incurred in removing liens, and repairing

equipment because there is no contractual basis to support recovery of such damages.

　　　　"Where the contract terms are plain and unambiguous, the intention of the parties and the

meaning of the contract are determined from the contract itself."  <u>Pepsi-Cola Bottling Co. of</u>

<u>Pittsburg, Inc. v. Pepsico, Inc.</u>, 175 F. Supp. 2d 1288, 1294 (D. Kan. 2001) (citations omitted).

Under Kansas law, "whether or not a contracting party's refusal to perform was because of a

genuine and good faith claim that a condition precedent failed is a question for the jury."

<u>Barbara Oil Company v. Patrick Petroleum Co.</u>, 1 Kan. App. 2d 437, 566 P.2d 389, 392 (1977).

　　　　Defendants argue that the Purchase and Sale Agreement provides that the defendants

should pay these expenses "At any Closing."  Defendants are correct as to the literal meaning of

the contract.  The Purchase and Sale Agreement clearly states that reimbursements should be

paid at closing, meaning the liability remained with PJ Gold prior to closing.  However,

defendants attempt to read more into the phrase – as if it said *only* at any closing.  The

reimbursement provision does not foreclose plaintiff's ability to seek compensation for expenses

that it incurred as a result of a breach.  Such a reading goes beyond the contract terms.  Although

defendants cite the contractual agreement between PJ Gold and McPherson as creating express

liability, this contract is irrelevant to the question of defendants' breach.  Clearly, PJ Gold is

liable to McPherson under the Option to Purchase Agreement, but this contract does not

foreclose PJ Gold's ability to recover from a third party.

**2. Indemnity Theory of Recovery**

As an alternative to the theory of liability in Count I, plaintiff argues in Count II that PJ

Gold is entitled to indemnity in removing mechanics' liens from the plant upon the failure of the

sales transaction.  The parties extensively reviewed the availability of indemnity as a theory of

recovery.  Plaintiff notes its availability in a tort action for indemnity, in a tort action for a

company's fault in creating a defective condition, and in actions for employer/employee and

principal/agent relationships.  See Kansas Public Employees Retirement System v. Reimer &

Koger Associates, Inc., 261 Kan. 17, 927 P.2d 466 (1996); City of Topeka v. Sash & Door Co.,

97 Kan. 49, 154 P. 232 (1916); St. Paul Fire & Marine Ins. Co. v. Tyler, 974 P.2d 611, 617 (Kan.

Ct. App. 1999).  Noticeably absent is the application of indemnity to contract actions.  "Kansas

law appears to limit implied indemnity to tort actions."  Nature's Share, Inc. v. Kutter Products,

Inc., 752 F. Supp. 371, 387 (D. Kan. 1990); Haysville U.S.D. No. 261 v. GAF Corp., 233 Kan.

635, 642, 645-46, Syl ¶ 5, 666 P.2d 192 ("Comparative negligence and implied comparative indemnity are tort-based theories and cannot be applied to contract law.").  While the Kansas courts have not expressly restricted the doctrine of implied indemnity, they have not applied the theory to contract insofar as the court or the parties can find.  Based on this noticeable and striking absence, the court declines to extend Kansas law and grants defendants' motion for summary judgment on plaintiff's indemnity theory of recovery  in Count II.

### E. Shell Advance

In Count III, plaintiff alleges that the Candlewood defendants failed to reimburse PJ Gold $.30 per shell advance, which would total $99,684 in overcharges.  Plaintiff alleges that the advance was referenced in the BLOI and a purchase order dated November 4, 2002.  In their motion for summary judgment, defendants argue that there is no evidence to support that payment in excess of $.70 was an advance.  The parties dispute whether the amended affidavit of Joe Smith constitutes sufficient personal knowledge to withstand summary judgment and whether the use of his testimony violates the statute of frauds.

In Kansas, the meaning of the contract is to be determined by the plain and unambiguous terms of the written instrument.  United Tunneling Enterprises, Inc. v. Havens Const. Co., Inc., 35 F. Supp.2d 789, 793-94 (D. Kan. 1998);  Wolfgang v. Mid-America Motorsports, Inc., 111 F.3d 1515, 1524 (10th Cir. 1997); Fasse v. Lower Heating & Air Conditioning, 241 Kan. 387, 736 P.2d 930, 933 (1987).  A contract may be deemed ambiguous because it includes provisions or language of doubtful or conflicting meaning, as gleaned from a natural and reasonable interpretation of its language.  Patrons Mut. Ins. Ass'n v. Harmon, 240 Kan. 707, 713, 732 P.2d

741 (1987).  A finding of ambiguity is not compelled merely because the parties differ over the meaning of a term. TMG Life Ins. Co. v. Ashner, 21 Kan.App.2d 234, 242, 898 P.2d 1145 (1995).  It is for the court to determine whether an ambiguity exists as a question of law.  Weber v. Tillman, 259 Kan. 457, 476, 913 P.2d 84 (1996).  If the contract is shown to be ambiguous on its face, the court may look to parol evidence in interpreting the contract.  Sunflower Pork, Inc. v. Consolidated Nutrition, L.C, No.03-2045-JAR, 2004 WL 1212052, at *7 (D. Kan.  June 1, 2004).  See Decatur County Feed Yard, Inc. v. Fahey, 266 Kan. 999, 974 P.2d 569, 575 (1999); Kay-Cee Enter., Inc. v. Amoco Oil Co., 45 F. Supp.2d 840, 843 (D. Kan. 1999).  The court considers ' "all language employed, the circumstances existing when the agreement was made, the object sought to be attained, and other circumstances, if any, which tend to clarify the real intention of the parties.' " Universal Motor Fuels, Inc. v. Johnston, 260 Kan. 58, 63, 917 P.2d 877 (1996) (quoting Richardson v. Northwest Central Pipeline Corp., 241 Kan. 752, 758, 740 P.2d 1083 (1987)).

The BLOI includes discussion of a payment of $814,000, which was to be offset from a $1.5 million payment.  Ex. C, at 1.  At ¶ 4 of the BLOI, the parties noted that the manufacturing of any additional shells would not exceed $.75.  Based on this letter, the court questions why PJ Gold would pay anything more than $.75 for the shells.  When combined with the fact that the purchase order specifically mentions "prior overcharges," the court finds questionable defendants' contention that the excess payment was voluntary.  Ex. B, at 2.  Because ambiguity exists as to the meaning of the prior overcharges, the court cannot grant defendants' motion for summary judgment as a matter of law for the shell advance.  Parol evidence may be necessary to resolve the ambiguity as to the prior overcharges.

**F. Storage Fees**

Defendants again argue that there is no contractual basis for the alleged unpaid cold storage fees.  If defendants' argument is based on the fact that the Purchase and Sale Agreement contract is illusory, then this argument fails.  This court has already found the Purchase and Sale Agreement contract not to be illusory.  Since the Candlewood defendants breached the contract by not delivering the Purchase Price in escrow, plaintiff may seek recovery of damages reasonably stemming from the Purchase and Sale Agreement.  See MLK, Inc. v. University of Kansas, 23 Kan. App. 2d 876, 876 Syl. ¶ 2, 940 P.2d 1158, 1159 (Kan. App. 1997).  In the alternative, defendants' admitted that Candlewood was assigned and received payment for the production of pizza dough pursuant to the BLOI.  Although the parties dispute whether the Smith affidavit provided sufficient personal knowledge to withstand a motion for summary judgement, the court finds the evidence relevant to determining what the parties meant in the BLOI since the terms on their face are ambiguous.  See supra III.E.  As a result, plaintiff may also advance a contractual theory of recovery based on the BLOI and a purchase order dated November 4, 2002.

The second issue as to storage fees is the meaning of F.O.B. "Pick-up @ Cold Storage."  Under Kansas law, F.O.B. designates that liability remains with the seller, or "free on board," until delivery as specified.  See, e.g., Hurst v. Altamont Mfg. Co., 85 P. 551 (Kan. 1906) (holding that "f. o. b. cars," when used in a contract between a buyer and seller of commercial commodities, where the use of a common carrier is necessary, means that the seller will secure the cars, load them, and do whatever may be required to accomplish the shipment free of expense to the buyer.); Custom Built Homes Co. v. Kansas State Commission of Revenue and Taxation, 184 Kan. 31, 43, 334 P.2d 808, 818 (Kan. 1959) (holding that "to furnish and deliver

19

prefabricated house units F. O. B. building site in Wyandotte County, Kansas" meant title to all of the unassembled parts of a prefabricated house delivered as a unit was required to pass at one time under the contract). Here, the delivery event is the pick up at cold storage. Defendants try to argue that delivery was complete and title passed when the goods arrived or were delivered to the cold storage. This interpretation, however, ignores the fact that the directions specifically state "Pick-up." This can only mean that title passes when the buyer picks up the goods. As such, the title did not pass until the pick up, and liability for the cold storage fees remains with the seller until the pick up. Although the court could not find a case directly addressing what "pick up" means, the court finds that there is little ambiguity in the instruction. There is no evidence that PJ Gold voluntarily paid the storage fees so as to absolve the Candlewood defendants' liability for these expenses. Thus, summary judgment is inappropriate.

In conclusion, the court denies summary judgment on all counts except the issue of indemnity. Since defendants breached the Purchase and Sale Agreement, plaintiff may attempt to recover expenses reasonably related to the breach. See Denman v. Aspen Drilling Co., 214 Kan. 402, Syl. ¶ 2, 520 P.2d 1303 (Kan. 1974) ("The measure of damages recoverable for a breach of contract is limited to such damages as may fairly be considered as arising in the usual course of things from the breach itself, or as may reasonably be assumed to have been within the contemplation of the parties as the probable result of such a breach."). But see Fisher v. Tomlinson Oil Co., Inc., 215 Kan. 616, 618, 527 P.2d 999, 1001 (Kan. 1974). Since the court has found the terms of the BLOI ambiguous on their face, plaintiff may also seek recovery for expenses incurred related to the alleged breach of this agreement.

IT IS ACCORDINGLY ORDERED this 11th day of April, 2005, that the court denies in

part and grants in part defendants' Motion for Summary Judgment (Dkt. No. 40).

s/ J. Thomas Marten

J. THOMAS MARTEN, JUDGE